Tiberio P. DeJULIO and Eva C. Galambos, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

State of GEORGIA, et al., Defendants.

No. CIV. A. 1:00CV273-TW.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 26, 2001.

---

Susan Pease Langford, Bruce Patrick Johnson, Office of Atlanta City Attorney Law Department, Atlanta, GA, for Movant.

Michael J. Bowers, Matthew B. Ames, Meadows Ichter & Trigg, Atlanta, GA, for Plaintiffs.

Sewell R. Brumby, Office of Georgia Legislative Counsel, Dennis Robert Dunn, Kyle A. Pearson, Office of State Attorney General, Atlanta, GA, for Defendants.

## ORDER

THRASH, District Judge.

This is a voting rights action brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the Constitution of the United States, and the Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.*, as amended. It is before the Court on Defendants' Motion to Dismiss [Doc. 5] pursuant to Fed.R.Civ.P. 12(b)(6), Plaintiffs' Motion for Partial Summary Judgment [Doc. 13], Plaintiffs' Motion for Certification of Class Action [Doc. 17], and Defendants' Motion to Dismiss the Amended Complaint [Doc. 20].

## I. BACKGROUND

The doctrine of "one person, one vote" is now a bedrock principle of federal constitutional law. This case is the latest chapter of a long saga in which this doctrine has been used to challenge political institutions in Georgia. A brief historical review will put this case in context. As far back as the first Georgia Constitution in 1777, Georgia apportioned legislative seats on a county-unit basis. Each county or group of counties was allocated one or more representatives. Larger counties generally received more representatives, but not proportionate to their population. With respect to the Georgia House of Representatives, the Constitution of 1877 and later the Constitution of 1945 provided that the

six most populous counties would have three representatives each, the twenty-six next largest counties would have two representatives each, and the remaining counties (ultimately 127), would have one representative each. With respect to the Georgia Senate, each county initially had one senator. Later, Senate districts were adopted that generally consisted of three contiguous counties. In these districts, the Senate seat rotated each two years among the three counties.[1] An exception to this system was made for the State's two largest counties. Fulton County was a Senate district by itself. Chatham and Effingham counties constituted a two-county Senate district.

What became known as the "county-unit system" also was used to determine the winning candidate in statewide primary elections, first based on Georgia Democratic Party rules, and eventually as a result of the Neill Primary Act of 1917. The county-unit system was used for every statewide Democratic primary contest except for the election of 1908 when Governor Hoke Smith temporarily succeeded in repealing it.[2] In general, the county-unit system declared the candidate with a majority of the county units as the winner of the primary election. County units were awarded on a winner-take-all basis for each individual county. The candidate who won a plurality of the vote in a county received two votes multiplied by the number of representatives that county had in the Georgia House of Representatives.

For statewide races, the county-unit system had two principal effects. First, it effectively nullified the votes cast for all candidates except the winning candidate within a county, because the candidate who won the popular vote of a county received all county-unit votes for that county. This meant that a candidate could win a statewide primary election without anything close to a majority of the votes. For example, in 1954, Marvin Griffin won a majority of the county-unit votes and the Democratic Party's nomination for Governor with only thirty-six percent of the popular vote.[3] Second, the county-unit system under-represented votes from the urban areas of the state. This disparity increased over time as the cities grew, and generally precluded the election to statewide office of individuals from urban areas.[4] By 1946 a single vote for a statewide political candidate cast in sparsely populated Chattahoochee County counted 107 times more than a vote cast in the same

1. *See* James F. Cook, *Carl Sanders: Spokesman of the New South* 59 (1993) ("Under the existing system of rotation, it was virtually impossible for a senator to remain in office long enough to amass much political clout. Only the senator from Fulton County could succeed himself; all the others had rotating districts. Thus, the Senate was a lame duck body on the day it was elected, and the House, where seniority prevailed, usually overshadowed it.").

2. The county-unit system was such a potent political institution that its repeal by Governor Smith and his Progressive followers created a backlash that, in part, made Smith the first incumbent governor to lose reelection since the Constitution of 1877's enactment. Numan V. Bartley, *The Creation of Modern Georgia* 161 (2d ed.1990); C. Vann Woodward, *Tom Watson: Agrarian Rebel* 339 (2d ed.1973); Dewey W. Grantham, Jr., *Hoke Smith and the Politics of the New South* 191 (1958). Curiously, even the editor of the *Atlanta Constitution* voiced support for the county-unit system, saying that its abrogation "is by all odds the most revolutionary measure that has ever been thrust upon the people of Georgia," "will destroy rural influence," and was "forced down the throats of the people." Bartley, *supra*, at 161–62.

3. James F. Cook, *The Governors of Georgia, 1754–1995* 260 (1995).

4. *See* Ivan Allen, Jr., *Mayor: Notes on the Sixties* 28 (1971) ("I eventually reached a point where I thought I might be a candidate for governor myself, and in 1958 began feeling out my possibilities .... But a simple fact of life in those days was that because the rest of Georgia was so much more conservative than Atlanta and because there was a county-unit election system to give the rural counties more strength than the urban areas, no Atlantan stood a chance of being elected governor.").

election in urban Fulton County.[5] In the General Assembly, the county-unit system led to severe malapportionment which dramatically increased in the decades after World War II. By 1960 legislators representing less than one-fourth of the population commanded clear majorities in both the Georgia House of Representatives and Georgia State Senate.[6] The conservative, rural politicians and legislators who were its beneficiaries had no incentive whatsoever to reform the system.[7]

For the first sixty years of the twentieth century, the traditional legal conclusion was that such electoral malapportionment was a nonjusticiable political question that could not be redressed by a federal court. This traditional view, however, met its demise in March 1962 when the Supreme Court of the United States held in *Baker v. Carr*, 369 U.S. 186, 188, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), that the method by which the State of Tennessee apportioned its state legislature was a justiciable controversy that the federal courts could address. One hour and seventeen minutes after the Supreme Court rendered its decision in *Baker v. Carr*, voters in Georgia filed suit in this Court challenging the constitutionality of the county-unit system in statewide primaries.[8] A month later, a three-judge district court held, in a decision authored by then-Fifth Circuit Judge Griffin Bell, that the Georgia county-unit system as applied to statewide primaries was unconstitutional. The Court found "invidious discrimination" in the county-unit system's unequal weighting of votes and enjoined the State from using the system in the 1962 primaries. *Sanders v. Gray*, 203 F.Supp. 158, 170 (N.D.Ga.1962). In due course, the Supreme Court upheld the grant of the injunction, stating that "[t]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 369, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

A second action also was filed in this Court challenging the constitutionality of the apportionment of the Georgia General Assembly. Shortly after the District Court decision in *Sanders v. Gray*, a three-judge district court, speaking through Judge Elbert Tuttle of the Fifth Circuit, held that "so long as the Legislature of the state of Georgia does not have at least one house elected by the people of the State apportioned to population, it fails to meet

---

5. See V.O. Key, *Southern Politics in State and Nation* 119–24 & tbl. 13 (1984) (1949) (stating that 14,092 votes were cast per unit vote in Fulton County in 1946, whereas only 132 votes were cast per unit vote in Chattahoochee County).

6. See *Toombs v. Fortson*, 205 F.Supp. 248, 251 (N.D.Ga.1962) (taking judicial notice of representation breakdowns based on 1960 Census data). It should be emphasized that legislative malapportionment was not unique to Georgia. In Florida, a majority of the legislature represented only one-eighth of the population. In Alabama, Oklahoma, and Tennessee, a majority of legislators represented about one-fourth of the population. The least imbalanced legislatures were those in Arkansas, Kentucky, and Virginia, where rural voters enjoyed only twice the representation of urban voters. See Numan V. Bartley, *The New South, 1945–1980* 167 (1995) (citing Malcolm E. Jewell, *State Legislatures in Southern Politics*, Journal of Politics, vol. XXVI (1964)).

7. One Georgia governor proclaimed that "Georgia's two greatest traditions [are] segregation and the county-unit system." Kenneth Coleman, ed., *A History of Georgia* 395 (2d ed.1991). Another governor, Eugene Talmadge, bragged that he did not campaign in counties with streetcars. He still won seven of the ten statewide primaries he entered during his political career. See generally William Anderson, *The Wild Man from Sugar Creek* (1975) (detailing Talmadge's political career). His son Herman, himself a governor and United States senator, later reminisced that "[s]ince Papa and I derived much of our support from the rural areas, we thought the [county-unit] system was just fine." Herman E. Talmadge, *Talmadge: A Political Legacy, a Politician's Life* 105 (1987).

8. Frederick Allen, *Atlanta Rising* 115 (1996).

constitutional requirements." *Toombs v. Fortson,* 205 F.Supp. 248, 257 (N.D.Ga. 1962), *vacated in part, Fortson v. Toombs,* 379 U.S. 621, 622, 85 S.Ct. 598, 13 L.Ed.2d 527 (1965).[9] Within two years after *Toombs v. Fortson* was decided by this Court, the Supreme Court firmly extended the "one person, one vote" doctrine to the area of legislative apportionment, holding that equal protection requires seats in *both* houses of a bicameral state legislature to be apportioned according to population. *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

> Full and effective participation by all citizens in state government requires ... that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less.

*Id.* at 565, 84 S.Ct. 1362. "One person, one vote" today is a bedrock constitutional principle that undergirds our system of representative democracy.

Based on the Supreme Court precedent of *Reynolds v. Sims* and its progeny, Plaintiffs have filed this action against the State of Georgia, its state legislative bodies, the Fulton County House and Senate delegations, other unspecified local legislative delegations, the Governor, the Lieutenant Governor, the Speaker of the House, and other state government officials alleging that the State once again is violating the "one person, one vote" constitutional requirement. The gravamen of Plaintiffs' Amended Complaint is that the method by which the Georgia General Assembly enacts "local legislation" violates the principle of "one person, one vote." Local legislation is legislation that applies to a specific city, county, or special district. Major changes in local governments' governance must be approved by the General Assembly because local governments are creations of the State. Local legislation is introduced to create or abolish cities, change city boundaries, alter forms of local government, create local authorities or special districts, and make other changes that apply only to the particular political subdivision named in the bill. Local legislation typically comprises a large portion of the bills introduced in and enacted by the General Assembly each year. Approximately one-third of all legislation enacted by the General Assembly during its 2000 session was local legislation. In the 1999 session, local legislation constituted 52.5% of all enacted legislation.

To handle this volume of local legislation effectively and efficiently, the Georgia House of Representatives and Georgia State Senate have adopted internal procedures for the consideration of local legislation by their respective bodies. For each county, municipality, or other jurisdiction, there is a "local delegation" for that jurisdiction. The local delegation for each jurisdiction consists of all members of that house who represent any portion of the jurisdiction. These local delegations make recommendations to the House and Senate standing committees which recommend local legislation to the entire body.

Local legislation introduced in the House of Representatives is assigned to the State Planning and Community Affairs Committee after its first reading on the House floor. House Rule 11 provides that a majority of the representatives whose districts lie within a political subdivision may file with the State Planning and Community Affairs Committee their own local rules for consideration of local legislation. The Fulton County House Delegation, for example, has filed its own rules that require a simple majority vote of the mem-

9. The Georgia reapportionment cases had a profound effect upon the political landscape at all levels of government. *See* Jimmy Carter, *Turning Point: A Candidate, a State, and a Nation Come of Age* 27 (1992) ("I didn't know it then, but the outcome of these two cases would transform the political scene in Georgia and would shape the future of my life."); Zell Miller, *The Mountains Within Me* 130 (1985) ("[A]fter reapportionment ended the rotation system, I decided to run for reelection to the Senate.").

bers in attendance, if a quorum is present, for the delegation to support a local bill. Absent local delegation rules filed with the State Planning and Community Affairs Committee, unanimous support from the local delegation is required for the committee to report local legislation favorably to the full House with a "do pass" recommendation.

Similarly, local legislation introduced in the Senate is assigned to the State and Local Government Operations Committee after its first reading on the Senate floor. Senate Rule 187(u) provides that local legislation in the Senate generally must be approved by a majority of the senators who represent the locality in question. By custom and practice—although there is no specific Senate rule—the Senate has permitted and respected the right of local delegations to adopt rules for consideration of their own local legislation. The Atlanta/Fulton Senate Delegation, for example, has adopted local rules that require a simple majority vote of the members present, if there is a quorum, for the delegation to support a local bill. Regardless of whether the procedures followed are those spelled out in the Senate Rules or a local delegation's own rules, a local bill must receive the requisite majority from the local delegation to be reported favorably out of the State and Local Government Operations Committee with a "do pass" recommendation. If the local Senate delegation is equally divided, the bill nevertheless may be favorably reported to the full Senate by the State and Local Government Operations Committee following consideration of the bill on the merits.

Although local legislation is debated within a local delegation, it seldom is debated on the floor of the House or Senate. To conserve the limited time of a forty-day legislative session and because local legislation seldom is challenged on the floor, the House and Senate both permit numerous local bills to be voted on each day by the full body through a "local consent calendar," a calendar that contains uncontested local legislation. Most local bills with support of the requisite majority of the local delegation are placed on the local consent calendar and passed by the full House and Senate without any opposition from the floor pursuant to a tradition of "local courtesy." The assumption that underlies local courtesy is that when a local delegation agrees on the need for local legislation that affects a city or county alone, other representatives and senators should defer to its judgment and support the bill, knowing that the same courtesy will be extended to them on their local legislation. Local courtesy, however, is only a custom. It is not provided for in either the House or Senate rules and cannot be enforced should a member choose to challenge local legislation on the floor of the House or Senate. Also, Senate Rule 113(e) specifically provides that three senators, only one of whose district must lie within the political subdivision directly affected, may have a particular local bill removed from the local consent calendar by objecting to it in writing. Nevertheless, such challenges seldom happen, and it is undisputed that, in practice, the local delegations propose all local legislation; and this legislation typically, but not always, is "rubber-stamped" by the full General Assembly without further discussion or debate. Following enactment by both houses of the General Assembly, local legislation must be signed by the Governor within forty days following the end of the legislative session to become law.

The named Plaintiffs, Tiberio P. DeJulio and Eva C. Galambos, bring this action as representatives of two putative classes of Plaintiffs: (1) all Georgia voters whose vote with respect to local legislative matters allegedly is diluted by the existing local legislation scheme; and (2) all Georgia voters who reside in unincorporated Fulton County whose vote with respect to local legislative matters allegedly is diluted by the existing local legislation scheme. Defendants are the State of Georgia, the Georgia House of Representatives, the Georgia State Senate, various county

House and Senate delegations, and various individual Defendants who are officials of the State of Georgia allegedly involved in how the State enacts local legislation. The individual Defendants are Roy E. Barnes, in his official capacity as Governor of Georgia; Mark F. Taylor, in his official capacity as Lieutenant Governor of Georgia and President of the Georgia State Senate; Thomas B. Murphy, in his official capacity as Speaker of the Georgia House of Representatives; James "Billy" McKinney, in his official capacity as Chairperson of the Fulton County House Delegation; and David Scott, in his official capacity as Chairperson of the Fulton County Senate Delegation. The individual county House and Senate Delegations listed as Defendants are the Fulton County House Delegation, the Fulton County Senate Delegation, and "unknown 1–158 Doe County House and Senate Delegations," reflecting legislative delegations for the 158 Georgia counties other than Fulton County.

Plaintiffs essentially raise two claims. First, they challenge as an unconstitutional infringement of equal protection the procedures and customs by which the Georgia General Assembly considers local legislation. It is these procedures that Plaintiffs contend violate the "one person, one vote" requirement. They contend that their vote is diluted in comparison to other Fulton County voters whose senators and representatives represent only a small portion of Fulton County ("split districts"), but who have an equal vote in the Fulton County local delegation. They also assert an equal protection claim because Atlanta legislators vote on local legislation affecting unincorporated Fulton County, but not vice versa. Second, Plaintiffs contend that the rules of the Fulton County House and Senate Delegations and other unnamed county delegations have not been precleared by the Attorney General of the United States or the United States District Court for the District of Columbia as required by the Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.*, as amended.

As support for their argument that each legislator's vote on local legislation is not equal from a representation standpoint, Plaintiffs have submitted 1990 decennial census population data compiled by the Reapportionment Services Unit of the Georgia General Assembly. Plaintiffs allege that in forty-seven counties a House member with constituents in the county has one vote on local legislation while another House member with fewer constituents in the county also has one vote on local legislation affecting the county. Plaintiffs allege that in twenty-one counties a senator with constituents in the county has one vote on local legislation while another senator with fewer constituents in the county also has one vote on local legislation affecting the county. Overall, Plaintiffs allege that voters in fifty-three of Georgia's 159 counties have been denied equal protection by the method in which the General Assembly considers local legislation. Illustrative of these allegations is the population data compiled for Fulton County.

| Senate District | Fulton County Residents |
| --- | --- |
| 34 | 6,848 |
| 35 | 109,880 |
| 36 | 110,151 |
| 38 | 105,761 |
| 39 | 110,691 |
| 40 | 111,380 |
| 48 | 5,915 |
| 56 | 88,325 |

Each senator has one vote on matters of local legislation. Similar data for the Fulton County delegation in the House of Representatives is as follows.

| House District | Fulton County Residents |
| --- | --- |
| 41 | 34,368 |
| 42 | 37,316 |
| 43 | 35,604 |
| 44 | 36,985 |
| 45 | 37,150 |
| 46 | 35,360 |
| 47 | 37,015 |
| 48 | 37,711 |
| 49 | 37,033 |
| 50 | 34,846 |
| 51 | 32,239 |
| 52 | 35,120 |
| 53 | 36,999 |
| 54 | 35,980 |
| 55 | 34,663 |
| 56 | 36,312 |
| 57 | 36,075 |
| 58 | 37,775 |

It is apparent that there are fewer split districts in the Fulton House delegation than in the Senate delegation. Nevertheless, one split district does exist (House District 51, with 14.7% of its population coming from neighboring Cobb County), and each of the eighteen Fulton House members has one vote on matters of local legislation.

Plaintiffs seek declaratory relief from this Court to the effect that the current procedures for enactment of local legislation of the Georgia General Assembly are unconstitutional. They seek injunctive relief that would enjoin the State of Georgia from enacting any further local legislation until the adoption of procedures that do not violate the Fourteenth Amendment. Plaintiffs also seek a declaratory judgment that the Rules of the Fulton County House Delegation and the Atlanta/Fulton County Senate Delegation are unconstitutional; and injunctive relief enjoining the enactment of all local legislation pertaining to the City of Atlanta and Fulton County until the delegation rules are restructured in a manner that does not violate the Fourteenth Amendment. Finally, Plaintiffs seek a ruling that the rules of the Fulton County House Delegation, the Atlanta/Fulton County Senate Delegation, and other unnamed county House and Senate delegations violate the Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.*, as amended, because they were not precleared by the Attorney General of the United States or approved by the United States District Court for the District of Columbia.

Defendants have responded with a Motion to Dismiss the original Complaint and a subsequent Motion to Dismiss Plaintiffs' Amended Complaint. Plaintiffs have filed a Motion for Partial Summary Judgment, arguing that they are entitled to relief as a matter of law on Counts I, II, and III of their Amended Complaint, the counts that relate to the "one person, one vote" Equal Protection Clause claim. The Court previously entered an Order converting Defendants' Motion to Dismiss into a Motion for Summary Judgment. Because this case involves no disputed issues of genuine material fact, judgment by the Court as a matter of law as to the merits is appropriate.

## II. STANDARD OF REVIEW

A complaint should be dismissed pursuant to Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the plaintiff's claims for relief. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Linder v. Portocarrero,* 963 F.2d 332, 334 (11th Cir.1992). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.,* 711 F.2d 989, 994–95 (11th Cir.1983). Notice pleading is all that is required for a valid complaint. *Lombard's, Inc. v. Prince Mfg., Inc.,* 753 F.2d 974, 975 (11th Cir.1985). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *Id.*

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. DEFENDANTS' MOTION FOR JUDICIAL NOTICE

Defendants have filed a Motion for Judicial Notice [Doc. 6] pursuant to Fed R. Evid. 201. The Court previously entered an Order granting the motion without explanation. (Order, December 26, 2000.) [Doc. 35] Defendants request that the Court take judicial notice of the 2000 edition of the Rules of the Georgia House of Representatives and the 2000 edition of the Rules of the Georgia State Senate. Although a court *may* take judicial notice whether requested or not, a "court *shall* take judicial notice if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(c)-(d) (emphasis added). "[A] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Judicial notice "may be taken at any stage of the proceeding." Fed.R.Evid. 201(f).

■ After careful review, the Court concluded that it should take judicial notice of the Georgia House and Senate Rules. It is without dispute that the Georgia State Senate and Georgia House of Representatives have adopted and published the rules that Defendants ask the Court to judicially notice. This lack of dispute is reflected in Plaintiffs' failure to respond in opposition to Defendants' motion. Because the Georgia House and Senate Rules meet the requirements of Fed.R.Evid. 201, the Court takes judicial notice of them for the purposes of this action.

### B. CITY OF ATLANTA'S MOTION TO PARTICIPATE AS AN AMICUS CURIAE

■ The City of Atlanta has filed an amicus curiae brief, which it requests that the Court consider in deciding the case. The Court previously entered an Order granting the motion without explanation. (Order, December 26, 2000.) [Doc. 35] A provision of the Federal Rules of Appellate Procedure governs the filing of amicus briefs in cases on appeal. Fed. R.App. P. 29. There, however, exists no parallel provision in the Federal Rules of Civil Procedure or this Court's Local Rules to regulate the filing of an amicus brief in this District Court. The decision whether to allow a non-party to participate as an amicus curiae is solely within the broad discretion of the Court. *Resort Timeshare Resales, Inc. v. Stuart,* 764 F.Supp. 1495, 1500 (S.D.Fla.1991); *Ellsworth Assocs., Inc. v. United States,* 917 F.Supp. 841, 846 (D.D.C.1996).

■ The Court concludes that the City of Atlanta's motion should be granted. In *Mir v. Smith,* 521 F.Supp. 446, 450 (N.D.Ga.1981), Judge Shoob of this Court concluded that the State of Florida had "great concern" that reliable sponsors be found for released Cuban detainees, particularly those who resettle in Florida. Accordingly, Judge Shoob allowed the State of Florida to participate in the case as an amicus curiae. *Id.; see also Bloodworth v. Oxford Village Townhouses, Inc.,* 377 F.Supp. 709, 712 (N.D.Ga.1974) (permitting Atlanta Legal Society to participate as amicus curiae in case concerning housing cooperative project established pursuant to federal housing act). The City of Atlanta has an interest in how the Georgia General Assembly enacts local legislation. Additionally, Plaintiffs do not dispute Atlanta's interest in this litigation and do not explicitly oppose the filing of the amicus brief. *See* Plaintiffs' Response to Amicus Brief of City of Atlanta, at 2, 4 ("[The] City of Atlanta's interest in the outcome of the present litigation is described in Counts II and III of Plaintiffs' Complaint," and "[The] City of Atlanta has a profound interest in maintaining the status quo.").

**1285**

[Doc. 33] Because the City of Atlanta has demonstrated sufficient interest in this litigation, its Motion to Participate as an Amicus Curiae [Doc. 32] was granted.

### C. EQUAL PROTECTION

#### 1. INTRODUCTION

The Constitution of the United States guarantees to every state a republican form of government. U.S. Const. art IV, § 4. Pursuant to this constitutional authority, the State of Georgia has adopted its own constitution which vests legislative authority in a General Assembly consisting of two bodies, the Georgia House of Representatives and the Georgia State Senate. Ga. Const., art. III, § 1, ¶ 1. The Georgia House of Representatives consists of 180 members, and the Georgia State Senate consists of 56 members. Ga. Const., art. III, § 2, ¶ 1(a)-(b). The members of both houses are apportioned among representative districts of the state in accordance with the "one person, one vote" constitutional requirements of*Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and subsequent cases. Ironically, it is the requirement of "one person, one vote" that results in districts that cross county lines and districts that contain fewer county residents than other districts. Under the county-unit system, every vote within the county unit was equal.

The Georgia Constitution explicitly vests in the General Assembly the power and authority to determine its own rules of procedure. Ga. Const., art. III, § 4, ¶ 4. This authority specifically includes enacting procedures for consideration of local legislation. Ga. Const., art. III, § 5, ¶ 8. Both the Georgia House of Representatives and Georgia State Senate have exercised this constitutional authority by adopting their own rules of procedure, including rules that govern the consideration of local legislation. *See Rules of the House of Representatives* (2000) (providing rules of procedure for the Georgia House

of Representatives); *Rules of the Georgia State Senate* (2000) (providing rules of procedure for the Georgia State Senate). These rules additionally provide for local delegations and the enactment of local rules to govern those delegations.

Based on these rules, Plaintiffs have filed a Motion for Partial Summary Judgment as to Counts I, II, and III. Plaintiffs contend that the Rules of the Georgia House of Representatives, the Georgia State Senate, the Fulton County House Delegation, the Atlanta/Fulton County Senate Delegation, and other unspecified county House and Senate delegations violate the "one person, one vote" principle of the Fourteenth Amendment's Equal Protection Clause. Defendants have responded that Plaintiffs' suit should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. As mentioned above, the Court previously entered an Order converting Defendants' Motion to Dismiss into a Motion for Summary Judgment with respect to the merits of the case. (Order, December 26, 2000.) [Doc. 35]

#### 2. STANDING

 At the outset, Defendants contend that Plaintiffs do not have standing to bring this suit. Standing focuses on whether a litigant is the proper party to bring the lawsuit, not whether the issue itself is justiciable. The doctrine derives from the separation of powers on which our government is founded. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The Supreme Court has set forth an analytical framework for resolving standing issues that comprises both "constitutional" and "prudential" considerations. *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975);*Harris v. Evans,* 20 F.3d 1118, 1121 (11th Cir.1994); *Saladin v. City of Milledgeville,* 812 F.2d 687, 690 (11th Cir.1987). The constitutional requirements derive from Article III's limitation of federal jurisdiction to

those situations where a justiciable "case or controversy" exists between the litigants. *Warth*, 422 U.S. at 498, 95 S.Ct. 2197. In order to satisfy this "'irreducible' constitutional minimum," the plaintiff must show that (1) he has suffered an actual or threatened injury (often termed an "injury in fact"), (2) the injury is fairly traceable to the challenged conduct of the defendant, and (3) the injury is likely to be redressed by a favorable ruling. *Saladin*, 812 F.2d at 690; *accord Warth*, 422 U.S. at 498–99, 95 S.Ct. 2197.

■ In addition to these constitutional requirements, the Supreme Court has fashioned three principles of judicial restraint, which have become known as "prudential" considerations. These self-imposed constraints are intended to ensure the proper role of the courts in our tripartite system of government in order to avoid judicial resolution of abstract questions that are more appropriately addressed by the other branches of government or by the states. *Warth*, 422 U.S. at 500, 95 S.Ct. 2197. The three prudential considerations are (1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue, (2) whether the complaint raises abstract questions amounting to generalized grievances that are more appropriately resolved by the legislative branches, and (3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties. *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir.1994); *Saladin*, 812 F.2d at 690. The Eleventh Circuit has emphasized that, amid consideration of these factors, the central purpose of the standing requirement is "to ensure that the parties before the court have a concrete interest in the outcome of the proceedings such that they can be expected to frame the issues properly." *Harris*, 20 F.3d at 1121. Similarly, the Supreme Court has articulated the issue as follows:

Determining standing in a particular case may be facilitated by clarifying principles or even clear rules developed in prior cases. Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?

*Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). In short, the basic question in this case is whether Plaintiffs are adversely affected by the method by which the Georgia General Assembly enacts local legislation.

■ Plaintiff DeJulio alleges that he is a resident of and registered voter in unincorporated Fulton County; and that he is represented in the Georgia General Assembly by the representative for House District 45 and the senator for Senate District 40. He alleges that his voting strength is diluted by the fact that his representative and senator, who have higher constituent populations within Fulton County than some other Fulton County representatives and senators, nevertheless cast a single vote on local legislation just as the other Fulton County representatives and senators do. For example, he alleges that his Senate District at the time of the last decennial census in 1990 had a Fulton County population of 111,380, while Senate District 34 had a Fulton County population of only 6,848. Nevertheless, the senators for District 40 and 34 both cast one vote on local legislation. Plaintiff DeJulio also alleges that his voting strength is diluted because his state representative and senator do not vote on matters affecting the City of Atlanta, although representatives and senators from within the City of Atlanta may vote on local legis-

lation that affects only unincorporated Fulton County.

Plaintiff Galambos alleges that she is a resident of and registered voter in unincorporated Fulton County; and that she is represented in the Georgia General Assembly by the representative for House District 43 and the senator for Senate District 56. She alleges that her voting strength is diluted by the fact that her representative and senator, who have higher constituent populations within Fulton County than some other Fulton County representatives and senators, nevertheless cast a single vote on local legislation just as the other Fulton County representatives and senators do. For example, she alleges that her Senate District at the time of the last decennial census in 1990 had a Fulton County population of 88,325, while Senate District 34 had a Fulton County population of only 6,848. Nevertheless, the senators for District 56 and 34 both cast one vote on local legislation. Plaintiff Galambos also alleges that her voting strength is diluted because her state representative and senator do not vote on matters affecting the City of Atlanta, although representatives and senators from within the City of Atlanta may vote on local legislation that affects only unincorporated Fulton County.

Defendants respond by characterizing Plaintiffs' alleged injury as only that Plaintiffs "would organize the General Assembly differently or that they desire for the legislature to more favorably address legislation they favor." (Defendants' Reply to Plaintiffs' Response to Defendants' Motion to Dismiss, at 3.) [Doc. 21] Defendants contend that this alleged injury does not meet the injury in fact requirement for standing because Plaintiffs are not members of the Georgia General Assembly and, therefore, have no basis for objecting to how that body operates. Defendants also argue that Plaintiffs' assert a "nonexistent right to a 'particular kind of Government conduct' which the 'Government [allegedly] has violated by acting differently'" and

argue that this does not satisfy the requirements of causation and redressability. (Defendants' Brief in Support of Motion to Dismiss, at 9 (quoting *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).) [Doc. 5]

In *Baker v. Carr,* 369 U.S. 186, 187–88, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), voters in Tennessee sought a declaration that the Tennessee scheme of legislative apportionment deprived them of equal protection by impairing the effectiveness of their votes compared with those of voters in other counties. The Supreme Court concluded that the plaintiffs had standing because they had an interest in maintaining the effectiveness of their votes. There are certain obvious differences between this case and *Baker v. Carr.* In *Baker v. Carr,* the plaintiffs argued that their votes were diluted by the method by which the state apportioned its legislature. Plaintiffs here do not challenge the method by which the Georgia General Assembly is apportioned as a whole. It is without dispute that the apportionment of the General Assembly as a whole satisfies the "one person, one vote" constitutional standard. Consequently, Plaintiffs are not arguing that the votes they cast for their particular state representatives and senators have been diluted as compared to those votes that other voters elsewhere in the state cast for their elected legislators. Instead, Plaintiffs are arguing that it is their legislators whose votes are diluted in the General Assembly. Plaintiffs' alleged injury, therefore, is one step removed from the situation that existed in *Baker* and other similar cases where the Supreme Court held that the voters had standing to sue.

The question then is whether this distinction between the seminal reapportionment cases and this case destroys Plaintiffs standing to bring the suit and requires that the suit instead be filed by the allegedly injured legislators, as Defendants assert. Specifically, the Court must consider whether Plaintiffs allegedly have suffered a "distinct and palpa-

ble" injury in fact themselves, and, if not, whether Plaintiffs can assert third-party standing for the alleged injury to their legislators. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.");*Harris v. Evans,* 20 F.3d 1118, 1121–24 (11th Cir.1994) (discussing third-party standing requirements).

The Plaintiffs have not identified any specific legislation that they are interested in and that has been thwarted by the local delegation rules of the Georgia General Assembly. The Court will not speculate as to any possible distinct and palpable injury to Plaintiffs that may exist with respect to an unidentified legislative agenda. Nevertheless, with respect to the application of the rules of the House and Senate to the Fulton County local delegations, the Court concludes that Plaintiffs have alleged an injury in fact sufficient to confer standing in this case. As stated above, Plaintiffs do not allege that the votes they cast at the ballot box have themselves been diluted. They have an equal say with all other voters in Georgia in the election of senators and representatives. Nevertheless, they contend, the effect of their votes has been diluted by their election of legislators whose votes in the General Assembly are not on equal footing with all other legislators with respect to local legislation affecting Fulton County. Dilution of Plaintiffs' representation would be more obvious if the House and Senate rules specifically provided that Plaintiffs' legislators are provided only one vote on each bill that comes to the floor while other legislators are entitled to two votes. Although the facts of the case are not as simple as this hypothetical, the effect is the same.

Plaintiffs' entitlement to full and equal representation without invidious discrimination is sufficient to confer standing in this case. This does not mean that Plain-

tiffs and all Georgia voters are entitled to legislators of equal political power. The Speaker of the House will always have more political power than a freshman representative. That is the nature of the institution. Full and equal representation simply means that Plaintiffs are entitled to claim legislators of equal voting power without invidious discrimination. Presuming for the purposes of this issue that they have been denied full and equal representation, Plaintiffs have alleged sufficient injury in fact with respect to the application of the rules of the House and Senate to the Fulton County local delegations.

This case appears to be one of first impression. Nevertheless, the Court's conclusion follows from relevant case law. In at least one case, the Supreme Court in similar circumstances did conclude that the standing requirement was satisfied. In *Board of Estimate v. Morris,* 489 U.S. 688, 690–91, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), residents and voters of the New York City borough of Brooklyn sued the city's Board of Estimate on grounds that its composition was inconsistent with the Equal Protection Clause's "one person, one vote" requirement. The Board itself was a nonelective body composed of elective officials. The voters in *Board of Estimate* were not challenging the effectiveness of their votes for their city leaders. Their complaint was that each member of the Board of Estimate had one vote but represented constituencies of vastly disparate size. The Supreme Court allowed the voters to bring the case and ruled for them on the merits. In addition, the Court notes that the Fourth Circuit recently rendered judgment in a case somewhat similar to this one—at least for standing purposes—where South Carolina voters challenged as unconstitutional the role of that state's local legislative delegations. *Vander Linden v. Hodges,* 193 F.3d 268, 270 (4th Cir.1999). The standing of those voters to bring suit was not questioned in the Fourth Circuit's opinion.

In addition to alleging an injury in fact, Plaintiffs have sufficiently alleged that their injury is traceable to Defendants' actions and can be redressed by this Court. The cause of their injury is the rules that Defendants have promulgated to govern consideration of local legislation by the General Assembly. Furthermore, Plaintiffs' injury is redressable because it is possible for the Court to enjoin the present system and require the Georgia General Assembly to develop procedures that do not violate the Constitution. The Court need not develop its own alternative method for enacting local legislation in order to redress Plaintiffs' injury. As the Supreme Court stated in *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964),

> Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action
>
> . . . .

*Id.* Courts in voting cases realize that they are somewhat ill-suited for what inherently is a political task. *See Upham v. Seamon,* 456 U.S. 37, 41–42, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) ("In fashioning a reapportionment plan or choosing among plans, a district court should not preempt the legislative task nor 'intrude upon state policy any more than necessary.'" (Citation omitted.)). Consequently, courts often have left the creation of constitutional alternatives to the offending state legislature, subject to judicial oversight. *See, e.g., Reynolds,* 377 U.S. at 586, 84 S.Ct. 1362 (stating that "judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so");*Vander Linden v. Hodges,* 193 F.3d 268, 281 (4th Cir.1999) (remanding case to

permit state legislature to correct constitutional defect, subject to approval of the district court);*Johnson v. Miller,* 922 F.Supp. 1556, 1569 (S.D.Ga.1995) ("No plan of congressional redistricting created by court or legislature will achieve perfection. . . . We do no harm with this plan, which cures the unconstitutionality of the former and can serve in 'caretaker' status until the legislature convenes to change it."). Plaintiffs have alleged a "distinct and palpable" injury traceable to Defendants' conduct and capable of redress by this Court. Accordingly, Plaintiffs have satisfied the constitutional requirements for standing with respect to the application of the rules of the House and Senate to the Fulton County local delegations.

The Court also concludes that Plaintiffs have satisfied the prudential requirements of standing with respect to application of the House and Senate rules to the Fulton County local delegations. First, Plaintiffs' Amended Complaint falls within the zone of interests protected by the constitutional provision at issue. For almost forty years, it has been understood that the Equal Protection Clause protects the right of suffrage from debasement and dilution. *See, e.g., Reynolds,* 377 U.S. at 555, 84 S.Ct. 1362 ("And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). Second, Plaintiffs do not complain of general grievances more appropriately resolved by the legislative branch. The grievance of which they complain is a specific harm directed to them but not other Fulton County voters. It is not a generalized harm that all Georgia voters suffer. Third, Plaintiffs assert their own legal rights, not those of third parties. Plaintiffs allege that they themselves have been injured, not simply that their legislators have suffered injury. Consequently, prudential considerations support a finding that Plaintiffs possess standing to sue in this case.

Admittedly, a strong argument exists that the affected legislators also could bring suit, as Defendants contend. *Compare Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (granting standing to Congressman singled out for unfavorable treatment as opposed to other members), *and Coleman v. Miller,* 307 U.S. 433, 438, 446, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (granting standing to Kansas state legislators, whose votes were nullified, on grounds that they "have a plain, direct and adequate interest in maintaining the effectiveness of their votes"), *with Raines v. Byrd,* 521 U.S. 811, 829, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("In sum, appellees have alleged no injury to themselves as individuals (contra, *Powell*), the institutional injury they allege is wholly abstract and widely dispersed (contra, *Coleman*), and their attempt to litigate this dispute at this time and in this forum is contrary to historical experience."). The standing of legislators, however, does not automatically preclude standing to sue on the part of voters as well. "Once it is determined that a particular plaintiff is harmed by the defendant and that the harm will likely be redressed by a favorable decision, that plaintiff has standing—regardless of whether there are others who would also have standing to sue." *Clinton v. City of New York,* 524 U.S. 417, 434–436, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998). For legislators, it is the relative impotence of their vote that has caused them injury; for Plaintiffs themselves, it is their right to full representation by their duly elected legislators that allegedly has been injured. In the "one person, one vote" context, the Supreme Court has "squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Baker v. Carr,* 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). "No right is more precious in a free country than that of having a voice in the election of those who make laws under which, as good citizens, we must live." *Reynolds,* 377 U.S. at 560, 84 S.Ct. 1362. That voice is muted if the representatives we elect cannot speak for us on an equal basis with their colleagues.

This analysis applies with respect to the application of the Rules of the House and the Senate to the Fulton County local delegations and to the passage of local legislation affecting Fulton County. Whether Plaintiffs have standing with respect to the application of the House and Senate rules to other counties is more problematical. House Rule 11 and Senate Rule 187(u) do not provide an immutable scheme by which all county legislative delegations must handle their local legislation. The House and Senate rules instead are merely default rules that individual House delegations and individual Senate delegations may follow or not follow (by creating their own local delegation rules) even on the issue of voting requirements. It is the individual delegations themselves that determine the procedures that apply to their local legislation. Plaintiffs have not identified any injury that they have suffered due to the application of the House and Senate rules to other local delegations. Outside the Fulton County context, they assert only a generalized grievance about the operation of the General Assembly.

Furthermore, if, as Plaintiffs themselves contend, local laws are in essence passed by local delegations, the proof required in any suit necessarily will turn on the actions of individual legislative delegations, which act independently of all the other delegations. One local delegation's procedures and activities cannot harm voters outside of that local jurisdiction; the Georgia Constitution explicitly provides that no local law can be enacted that would repeal any portion of the general law of Georgia. Ga. Const., art. III, § 6, ¶ 4(a). Voters of other counties or municipalities may have grounds for challenging the rules of their own county legislative delegations on grounds not asserted by Plaintiffs in this action. Plaintiffs, however, do not have standing to assert potential grievances of voters in other counties. The injury in fact requirement and prudential consider-

ations dictate that Plaintiffs have standing to assert an equal protection challenge to the rules of the House and Senate only as applied to the Fulton County local delegations and local legislation affecting Fulton County.

### 3. POLITICAL QUESTION DOCTRINE

Next, Defendants contend that Plaintiffs' Amended Complaint raises only a nonjusticiable "political question." Prior to the Supreme Court's landmark decision in *Baker v. Carr*, issues regarding the relative strength of state voters were thought to be unreviewable as nonjusticiable "political questions." *Baker*, 369 U.S. at 208–09, 82 S.Ct. 691. Indeed, the Supreme Court itself previously had held that cases involving state legislative issues brought pursuant to Article IV's Guaranty Clause were nonjusticiable. *Luther v. Borden*, 48 U.S. (7 How.) 1, 11, 12 L.Ed. 581 (1849). In *Baker*, however, the Supreme Court ruled that the political question doctrine does not bar a federal court from deciding whether state electoral apportionment violates the Equal Protection Clause. *Baker*, 369 U.S. at 208–37, 82 S.Ct. 691.

■ Nevertheless, Defendants contend that this case falls within the ambit of the political question doctrine because Plaintiffs have brought this suit "in contravention of the principles of federalism and comity." (Defendants' Motion to Dismiss, at 3.) [Doc. 5] The political question doctrine, however, is based on concepts that underlie the separation of powers among the three branches of the federal government rather than notions of federalism between the federal government and the states. The Supreme Court in *Baker* clearly stated that the political question doctrine does not shield state action in the area of legislative apportionment from federal judicial review. Justice Brennan delivering the opinion of the Court wrote that "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.' " *Id.* at 210, 82 S.Ct. 691. This conclusion has been criticized by some commentators. *See, e.g.*, Robert F. Nagel, *Separation of Powers and the Scope of Federal Equitable Remedies*, 30 Stan. L.Rev. 661, 664 (1978) (arguing that separation of powers principles apply to relations between the federal judiciary and state governments so that federal courts do not automatically possess full range of power to remedy specific constitutional violations committed by state government). The Supreme Court, however, has never retreated from its position. *See e.g., Elrod v. Burns*, 427 U.S. 347, 352, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (Brennan, J., plurality opinion) ("The short answer to [the petitioner's] argument is that the separation-of-powers principle, like the political question doctrine, has no applicability to the federal judiciary's relationship to the states."); *Powell v. McCormack*, 395 U.S. 486, 517–22, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (reiterating that the political question doctrine arises from separation of powers concerns). Only where questions affecting states' interests have been confided to Congress or the federal Executive Branch can they be deemed nonjusticiable political questions. *See generally* 13A Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure* § 3534.1 (2d ed. 1984) ("If questions affecting states' interests are to be found political, it must have been because the underlying issues have been confided to Congress or the Executive, not because of concern for state rights as such.").

■ Defendants contend that this is a "political question" case because it implicates the Guaranty Clause. In Guaranty Clause cases, however, as in all other cases, it is the relationship between the federal judiciary and the other federal branches, and not the federal judiciary's relationship to the states, that gives rise

to a nonjusticiable political question. *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962);*cf. Davids v. Akers*, 549 F.2d 120, 126 (9th Cir.1977) (failing to conclude that Guaranty Clause issue arose in suit challenging Arizona House of Representatives' committee appointment process). Because this case does not touch issues related to the separation of powers among the federal Executive, Legislative, and Judicial branches, the Court must conclude that this case does not implicate the political question doctrine. *Accord Gordon v. Texas*, 153 F.3d 190, 194 (5th Cir.1998) ("[T]he potential for a clash between a federal court and other branches of the *federal* government is fundamental to the existence of a political question; a simple conflict between a federal court and state agencies does not implicate the doctrine." (emphasis in original.)); *Larsen v. Senate of Commonwealth of Pennsylvania*, 152 F.3d 240, 245 (3d Cir.1998) ("Thus, because the issues . . . call upon us to review the actions of a state legislature as opposed to the acts of one of the political branches of the federal government, the case does not present a typical 'political question' as that term has come to be defined."), *cert. denied, Larsen v. Afflerbach*, 525 U.S. 1145, 119 S.Ct. 1041, 143 L.Ed.2d 48 (1999); *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 701 (9th Cir.1992) (stating that the "political question doctrine arises primarily from concerns about the separation of powers within the federal government"); *see also Vander Linden v. Hodges*, 193 F.3d 268, 272 n. 2 (4th Cir.1999) ("The State's contention that the political question doctrine totally precludes judicial consideration of this case cannot prevail in the face of *Reynolds, Baker* [ ], and their progeny.").

### 4. PROPER PARTIES

 Defendants contend that the Governor of Georgia, Roy E. Barnes, should be dismissed from this suit on grounds that he is not a proper party to this action. According to Defendants, Plaintiffs' lawsuit attacks only operations of the State of Georgia's legislative branch, over which the Governor possesses no formal control. Consequently, Defendants argue that there is no relief that can be granted against the Governor to redress Plaintiffs' grievance. Defendants contend that the Court should dismiss all claims against the Governor pursuant to Fed.R.Civ.P. 12(b)(6). The Court agrees.

Plaintiffs base suit against Governor Barnes entirely on his veto power over legislation. They argue that the Governor is a necessary and indispensable party to this suit because he signs local legislation. Consequently, full relief cannot be obtained without enjoining him from signing such legislation. If, however, this Court were to grant Plaintiffs' injunction, there would be no local legislation passed by the General Assembly under the current rules. Plaintiffs' suit against the Governor, therefore, can only be based on the office's mere possession of the veto power and not any specific exercise of it. The bare existence of Governor Barnes' constitutional right to veto legislation cannot alone entangle him with the legislative branch's legislative function so as to make him a party to this case. Indeed, the Governor's veto power is at the heart of the State of Georgia's system of checks and balances, so that authority cannot be construed as itself foiling the separation of powers between the Governor and the General Assembly. Because the Georgia Constitution provides that "[t]he legislative, executive, and judicial powers shall forever remain separate and distinct," Ga. Const., art. I, § 2, ¶ 3, and Plaintiffs have provided no argument whatsoever that the Governor has unconstitutionally circumvented this requirement by attempting to control, direct, or participate in the General Assembly's method of enacting local legislation, the Defendants' Motion to Dismiss is granted as to Governor Barnes.

 Defendants also contend that the Georgia House of Representatives, the Georgia State Senate, and both bodies'

various local delegations are not proper parties because they have no legal identity under Georgia law. Defendants argue that the capacity to be sued is controlled by state law; and that none of these entities has such capacity. Accordingly, Defendants argue that the Georgia House and Senate and their various local delegations should be dismissed from this action. The Federal Rules of Civil Procedure provide that, except in cases of a partnership or other unincorporated association or the capacity of a receiver, the capacity to sue or be sued in cases dealing with entities other than individuals or corporations "shall be determined by the law of the state in which the district court is held." Fed.R.Civ.P. 17(b). In Georgia, lawsuits can proceed only where both the plaintiff and defendant are "legal entities." *Howard v. Brown*, 738 F.Supp. 508, 510 (S.D.Ga.1988); *Cravey v. Southeastern Underwriters Ass'n*, 214 Ga. 450, 453, 105 S.E.2d 497 (1958). Georgia law recognizes three categories of legal entities: (1) natural persons, (2) corporations, and (3) "such quasi-artificial entities as the law recognizes as being capable to sue." *Georgia Insurers Insolvency Pool v. Elbert County*, 258 Ga. 317, 318, 368 S.E.2d 500 (1988); *Cravey*, 214 Ga. at 453, 105 S.E.2d 497. The question is whether the Georgia House of Representatives, the Georgia State Senate, and their various local delegations fall within the third category.

After careful consideration, the Court concludes that the Georgia House of Representatives, the Georgia State Senate, and both bodies' various local delegations do not have capacity to sue and be sued. In the context of an unincorporated business association, the Georgia Supreme Court has held:

> An express statutory provision ... is not indispensable to an association's capacity to sue and be sued in the association's name; such a suit may be maintained by virtue of a necessary implication arising from statutory provisions, as in cases where an unincor-

porated association is recognized as a legal entity by statutes which do not in terms authorize it to sue or be sued as such.

*Cravey*, 214 Ga. at 453, 105 S.E.2d 497. The Court believes that this reasoning also applies to other "quasi-artificial entities," since the language is quite open-ended and not explicitly limited to business entities. Additionally, other courts, including the Georgia Supreme Court, have applied similar language to government bodies in related contexts. *See Howard*, 738 F.Supp. at 510 (probate court); *Parker v. Board of Educ. of Sumter County*, 209 Ga. 5, 5–6, 70 S.E.2d 369 (1952) (county board of education).

Applying *Cravey*, the Court concludes that the Georgia House of Representatives, Georgia State Senate, and the various county House and Senate delegations cannot be sued. This Court has found no express or implied constitutional or statutory authority—and Plaintiffs have not apprised the Court of any—that could support a finding of capacity in this case. *See, e.g.*, Ga. Const., art. III, § 6, ¶ 2 (stating specific powers of General Assembly). *See contra Georgia Insurers Insolvency Pool*, 258 Ga. at 318, 368 S.E.2d 500 (concluding that Elbert County is legal entity based on Georgia statute providing that "[e]very county is a body corporate with power to sue or be sued in any court").

This conclusion is consistent with both the Georgia Supreme Court's decision in *Parker v. Board of Education of Sumter County*, 209 Ga. 5, 5–6, 70 S.E.2d 369 (1952), where the court held that the Sumter County Board of Education could not be sued, and Judge Edenfield's conclusion in *Howard v. Brown*, 738 F.Supp. 508, 510 (S.D.Ga.1988), that the Burke County Probate Court is not a legal entity subject to suit. *Id.; Parker*, 209 Ga. at 5–6, 70 S.E.2d 369; *cf. Bond v. Floyd*, 385 U.S. 116, 131, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) (deciding merits of suit, which was filed not against the Georgia House of Representatives but rather against the

Speaker of the House, Speaker Pro–Tempore, several representative members, certain officers of the House, and the Secretary of State, where the House deprived member Julian Bond of constitutional rights). Accordingly, Plaintiffs' recourse is not against the Georgia House of Representatives, the Georgia State Senate, and the Fulton County House and Senate delegations, but rather against individual members of those bodies in their official capacities. Plaintiffs have sued Lieutenant Governor Mark F. Taylor, Speaker of the House Thomas B. Murphy, Fulton County House Delegation Chairperson James "Billy" McKinney, and Fulton County Senate Delegation Chairperson David Scott. Accordingly, although the Georgia House of Representatives, the Georgia State Senate, and the Fulton County House and Senate delegations are not proper parties and must be dismissed, the Court does not dismiss Plaintiffs' entire suit on this procedural basis because Plaintiffs also have sued proper individual representatives of the named bodies.

### 5. "ONE PERSON, ONE VOTE"

█ Defendants contend that a consideration of the merits reveals that the "one person, one vote" requirement does not apply to the Georgia General Assembly's local delegations or rules governing local legislation and, therefore, there is no equal protection violation. Plaintiffs conversely contend that the "one person, one vote" requirement does apply and Defendants are in violation of it. The Fourteenth Amendment's Equal Protection Clause "requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Certainly, the original meaning of "one person, one vote" has been satisfied by the equal apportionment of both houses of the General Assembly. The Supreme Court has gone further and held that the "one person, one vote" requirement applies "whenever a state or local government decides to select persons by popular election to perform governmental functions ...." *Hadley v. Junior College Dist.*, 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). Accordingly, for the Equal Protection Clause's "one person, one vote" requirement to apply to county House and Senate delegations, *Hadley* requires that Plaintiffs must show two things. First, Plaintiffs must show that the Fulton County House and Senate delegations are selected by "popular election." If they are, Plaintiffs must then show that these delegations perform "governmental functions." If the answers to both factors are in the affirmative, then the "one person, one vote" requirement applies to Fulton County House and Senate delegations.

█ Applying pertinent Supreme Court authority, it seems that the "popular election" prong of the *Hadley* test is clearly met. It is undisputed that the members of the Fulton County House and Senate delegations are popularly elected. *See* Defendants' Reply to Plaintiffs' Response to Defendants' Motion to Dismiss, at 6 ("The question here is not whether the members of the Georgia General Assembly are elected by popular vote from districts that are proportionally sized. They are."). [Doc. 21]. When public officials become members of a governmental body simply by virtue of their popular election to the legislature, they are deemed popularly elected for the purposes of the "one person, one vote" requirement. *See Board of Estimate v. Morris*, 489 U.S. 688, 694, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) (stating that New York City Board of Estimate is deemed popularly elected even though city officials who comprise it actually are elected in other capacities and only "become members as a matter of law upon their various elections" to other offices); *Vander Linden v. Hodges*, 193 F.3d 268, 273–74 (4th Cir.1999) ("Members of South Carolina's legislative delegations, like members of the Board of Estimate in *Morris*,

are popularly elected to other offices and, in the same way that the officials in *Morris* become board members, become delegation members as a matter of law 'upon their various elections.'"). In this case, members of the Georgia House of Representatives and Georgia State Senate become members of the county House and Senate delegations in which their districts are located merely by being elected to the House or Senate. The Rules of the Georgia House of Representatives specifically state:

> If a majority of the members of the House whose districts are wholly or partially located within a political subdivision shall file with the chairman of the Committee on State Planning and Community Affairs their own rules as to the number of representatives who must sign proposed legislation affecting that political subdivision before it will be favorably reported by the Committee on State Planning and Community Affairs, the committee shall observe such rules in considering such legislation. Otherwise, the committee shall not favorably report any legislation affecting a political subdivision unless all of the Representatives whose districts are wholly or partially located within the political subdivision shall sign such legislation.

*Rules of the Georgia House of Representatives*, Rule 11 (2000). The Rules of the Georgia State Senate similarly state that local legislation must be approved "by a majority of the Senators representing the political subdivision affected . . . ." *Rules of the Georgia State Senate*, Rule 187(u). It is clear that membership in the Georgia General Assembly's local delegations is determined by nothing more than (1) the election of a representative or senator and (2) the location of his or her district within a particular county or political subdivision. Because representatives and senators become delegation members not through appointment but simply by virtue of their popular election to the legislature, Georgia's local legislative delegations are deemed popularly elected. Accordingly,

Plaintiffs have satisfied the first prong of the *Hadley* test.

Plaintiffs, however, cannot satisfy the second prong of the *Hadley* test: that the Georgia General Assembly's local delegations engage in "governmental functions." The Supreme Court in *Hadley* looked both at precedent from prior cases and the government activities at issue in that case and provided a non-exhaustive list of functions that it deems governmental in nature. These governmental functions include the ability to levy and collect taxes, issue bonds, hire and fire employees, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, manage operations of educational institutions, establish and maintain jails, build roads and bridges, administer a county welfare system, perform duties in connection with elections, set a county's tax rate, and adopt a county budget. *Hadley v. Junior College Dist.*, 397 U.S. 50, 53–54 & n. 6, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *see also Avery v. Midland County*, 390 U.S. 474, 476–77, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (listing governmental functions).

Applying the *Hadley* test, the Fourth Circuit in *Vander Linden v. Hodges*, 193 F.3d 268, 277–78 (1999), concluded that South Carolina's local legislative delegations did engage in governmental functions. The Fourth Circuit emphasized that "[l]egislative delegations have played a critical role in the governance of South Carolina counties for more than a century" and "the system of locally elected county government was rejected because it had resulted in the election of large numbers of African–American officials." *Id.* at 270. Indeed, numerous South Caroline statutes provided authority for local legislative delegations to exercise power over local governments and their operations to the extent that the local delegations acted practically as surrogates for county governments. *Id.* (noting that

South Carolina legislative delegations historically had "controlled virtually every aspect of local government"). "[I]n addition to being state legislators, members of the Senate and House were effectively the county legislature and governing board." *Id.* at 271. Through the years, these legislative delegations retained significant local governmental functions, which the Fourth Circuit noted that the parties stipulated to include:

1. making and/or recommending appointments to boards and commissions;

2. approving and/or recommending the expenditure of money allocated by the South Carolina General Assembly for highways, parks, recreation, tourism, and other matters;

3. approving the budgets of local school districts;

4. initiating referenda regarding the budgetary powers and the election of governing bodies for a special purpose in public service districts;

5. approving the reimbursement of expenses for county planning commissioners;

6. approving county planning commission contracts with architects, engineers, and other consultants;

7. altering or dividing school districts of counties;

8. reducing existing special school levies in counties and school districts; and

9. submitting grant applications for planning, development, and renovating park and recreation facilities.

*Id.* It was these functions along with an additional "array of state statutes empowering the delegations to perform fiscal, regulatory, and appointive functions" that led the Fourth Circuit to conclude that the South Carolina legislature's local delegations performed governmental functions.[10] *Id.* at 277.

Plaintiffs contend that *Vander Linden* is authority that Georgia's local legislative delegations engage in governmental functions. Plaintiffs' argument, however, ignores important relevant distinctions between the role of South Carolina's local legislative delegations and the role of Georgia's local legislative delegations. Plaintiffs argue that the South Carolina statutes at issue in *Vander Linden* limit the powers of South Carolina's legislative delegations, while no such statutory limitations exist in Georgia. Accordingly, Plaintiffs argue that the case before the Court is an even stronger case for Plaintiffs than *Vander Linden* presented for the South Carolina plaintiffs. The facts, however, belie that conclusion. A reading of the statutes at issue in *Vander Linden* shows that South Carolina's local legislative delegations performed local governmental functions either in lieu of or in concert with local governments, depending on the situation. The statutes the Fourth Circuit cited in *Vander Linden* do not limit the role of South Carolina's local legislative delegations to consideration of local legis-

---

10. The additional unstipulated array of fiscal, regulatory, and appointive functions that the Fourth Circuit recognized were the power to direct the levy of taxes for the benefit of county hospitals; the power to approve the issuance of general obligation bonds by the governing authority of the regional airport districts; the power to waive penalties for a taxpayer's failure to make the required annual statement listing real and personal property; the power to approve the borrowing of funds by a regional higher education commission; the power to approve the acquisition of real property through the Heritage Trust Program; the power to create county and region-al housing authorities; the power to permit abolition of special police districts; the power to approve the condition for public use of lakes and ponds; the power to approve the licensing of new hunting preserves; the power to regulate the use of certain animal traps; the power to direct a closed season on fish for 60 days; the power to approve certain new or amended fishing regulations; the power to authorize a county to abandon its free or rental textbook system; the power to approve the use of vote recorders; and the power to approve polling places for voting precincts. *Vander Linden,* 193 F.3d at 277 n. 5.

lation. They instead broadly define the role of South Carolina's local legislative delegations in overseeing and approving local governments' general activities. Indeed, most of these statutes explicitly provide that the local legislative delegation, not the entire General Assembly, is the final authority. For example, S.C.Code Ann. § 55–17–20 provides that

[t]he governing authority of any regional airport district in this State [that meets certain criteria] may issue, without an election, general obligation bonds of the district in an amount as is within the constitutional debt limit applicable to the district for the purpose of paying the cost of maintenance, construction, renovation, extension, enlargement, improvement and acquisition of airports and suitable air navigation facilities; *provided, however, that as a condition precedent to the issuance of bonds a majority of the members of each delegation, including members of the House of Representatives and the Senate whose districts are located either wholly or partially within an airport district, must give their prior written approval.*

*Id.* (1999) (emphasis added). Similarly, another South Carolina statute provides that a county can spend state revenues obtained from forest lands only "upon the approval of a majority of the county legislative delegation, including the Senator." S.C.Code Ann. § 48–23–260 (1999). Yet another statute provides that a county's school districts can be altered either by the entire General Assembly *or* by the county board of education "[w]ith written approval of the Senator and the entire house legislative delegation from the county involved." S.C.Code. Ann. § 59–17–20 (1999). County legislative delegations even have been granted control over the use of public lakes and ponds in their county. S.C.Code Ann. § 50–13–2020 (1999). The list goes on. *See, e.g.,* S.C.Code Ann. §§ 12–27–390, 12–28–2730 (1999) (requiring gasoline tax revenues distributed to counties for water recreational resources to be approved "by a majority of the county legislative delegation, including a majority of the resident senators, if any"); S.C.Code Ann. § 44–93–170 (1999) (requiring "written request of a majority of the legislative delegation of the recipient county" for State Treasurer to release proceeds of Infectious Waste Contingency Fund); S.C.Code Ann. § 4–11–265 (1999) (stating that referendum in a county can be initiated by a majority of "[t]he legislative delegation of any county, including the Senator"); S.C.Code Ann. § 59–73–110 (1999) ("All existing special tax levies in all counties and school districts may be reduced as deemed advisable by the local boards of trustees and the county boards of education, with the approval of the Senator and at least one half of the members of the House of Representatives of a county in which such reduction is made.").

In contrast, no final governmental authority is granted to the Georgia General Assembly's local delegations. The Georgia Constitution explicitly provides that the General Assembly *as a whole,* not specific local delegations, is the legislative authority for Georgia's counties and municipalities. *See* Ga. Const., art. 3, § 5, ¶ 8 (providing that local legislation shall be read at least once before being voted on by the full General Assembly); Ga. Const., art. IX, § 2, ¶ 1 ("Any such local law shall remain in force and effect until amended or repealed as provided in subparagraph (b). This, however, shall not restrict the authority of the General Assembly by general law to further define this power or to broaden, limit, or otherwise regulate the exercise thereof. The General Assembly shall not pass any local law to repeal, modify, or supersede any action taken by a county governing authority under this section except as authorized under subparagraph (c) hereof."); Ga. Const., art. 9, § 2, ¶ 2 ("The General Assembly may provide by law for the self-government of municipalities and to that end is expressly given the authority to delegate its power so that matters pertaining to municipalities may be dealt with without the necessity of ac-

tion by the General Assembly."). The situation that existed in South Carolina before the *Vander Linden* decision is readily distinguishable from the situation that exists in Georgia today.

■■■ Plaintiffs nevertheless contend that the second prong of the *Hadley* test is satisfied because Georgia local legislative delegations engage in the governmental function of "lawmaking." According to Plaintiffs, the governmental function of lawmaking with regards to local legislation rests with local delegations rather than (or at least in addition to) the General Assembly as a whole. They argue that the "one person, one vote" requirement, therefore, must apply. First, the Court cannot agree that the existence of any role whatsoever in lawmaking raises a "one person, one vote" issue. If that is the principle that triggers the "one person, one vote" requirement, then all committees and subcommittees of the Georgia General Assembly, every other state's legislature, and the United States Congress would be subject to this requirement. The only legislative committee that could ever meet the "one person, one vote" requirement would be a "committee of the whole." Regardless of whether the result would be gridlock or seriatim enactment of much poorly vetted legislation, our republican form of government assuredly would suffer. Without the work of its committees, the Georgia General Assembly could not conduct its business in forty days. Clearly then, a mere advisory role in lawmaking as typically exists with legislative committees, subcommittees, and local legislative delegations cannot trigger the "one person, one vote" requirement. *See Education/Instruccion, Inc. v. Moore*, 503 F.2d 1187, 1189 (2d Cir.1974) (finding that "one person, one vote" requirement did not apply to councils whose roles essentially were "to acquire information, to advise, to comment and to propose"). The Fourth Circuit in *Vander Linden* did not reach a different conclusion. *See Vander Linden v. Hodges*, 193 F.3d 268, 281 (4th Cir.1999) ("The delega-

tions continue to exist and can lawfully exercise two-thirds of the powers that the dissent acknowledges to be theirs: the power to receive information and the power to make non-binding recommendations."). The Equal Protection Clause of the Fourteenth Amendment and the "one person, one vote" principle does not limit a legislative body to functioning as a committee of the whole. It does not require a properly apportioned legislative body to distribute power and influence so that every legislator is as powerful and influential as every other member of the body.

■■ Plaintiffs also contend that their vote is diluted because their representatives and senators do not get a vote on City of Atlanta local legislation. Citizens of Atlanta are also citizens of Fulton County, and there is good reason for thinking that their legislators should vote on local legislation affecting both jurisdictions. Citizens of unincorporated Fulton County are not citizens of the City of Atlanta. Plaintiffs are not deprived of any fundamental right or the subject of invidious discrimination by the fact that their legislators do not vote on local legislation affecting a political subdivision they do not represent.

The only remaining question then is whether passage of most local legislation in Georgia by a local consent calendar somehow distinguishes the facts here from the typical legislative committee system. In short, is full passage of local legislation in the House and Senate so ministerial as to render it nothing more than a sham formality? The Court concludes that it is not. Local legislation is not officially enacted by the General Assembly until it is voted for by a majority of the full House and Senate, whose members are from equally apportioned districts and who cast a single, equal vote on each item of legislation. Final floor passage is not rendered merely ministerial by members' deference to colleagues on items of greater importance to those colleagues. Such deference is a form of political compromise that un-

derlies the very existence of our republican form of government—and even underlay its creation. *See The Federalist* No. 37 (James Madison) ("To the difficulties already mentioned may be added the interfering pretensions of the larger and smaller States. We cannot err in supposing that the former would contend for a participation in the government, fully proportioned to their superior wealth and importance; and that the latter would not be less tenacious of the equality at present enjoyed by them. We may well suppose neither side would entirely yield to the other, and consequently that the struggle could be terminated only by compromise.").

Furthermore, nothing except discretionary deference to "local courtesy" prevents members of the General Assembly from contesting any local legislation of which they disapprove. Any member in either body can object on the floor to passage of the local consent calendar any morning that he or she wishes. Also, nothing in the House or Senate rules prevents a member from arguing to the House State Planning and Community Affairs Committee and the Senate State and Local Government Operations Committee that they should not report a bill to the full House or Senate, even if the requisite majority of the local delegation supports it. The

House and Senate Rules state that a bill must have support of the requisite majority of the local delegation for the committee to send it to the floor with a "do pass" recommendation. The reverse, however, is not true. Nothing in the rules requires that the House and Senate committees must send a local bill to the floor once the requisite majority of the local delegation supports it. Additionally, in the Senate, Rule 113(e) specifically provides that three senators, only one of whose district must lie within the political subdivision directly affected, may have a local bill removed from the local consent calendar by objecting to it in writing. Accordingly, regardless of whether any objection typically is pursued or not, this Court cannot conclude that final passage of local legislation by the full House and Senate is merely ministerial. Passage of legislation is the principal governmental function of the legislative branch. Because full passage of local legislation—like all other legislation—by the full General Assembly is required and meaningful debate on the House floor is allowed, even if seldom exercised,[11] the Court cannot conclude that the governmental function of the General Assembly has been subverted in regards to local legislation and placed solely in the hands of the local delegations.

---

11. Plaintiffs contend that *Vander Linden* requires the Court to analyze not the technical authority that the local delegations do or do not enjoy, "but rather what they actually do." (Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment, at 10–11.) [Doc. 29] Accordingly, Plaintiffs contend that it is the General Assembly's typical "mechanical" passage of local legislation that matters and a finding "that the local legislation delegations in Georgia do not have statutory authority to technically enact legislation does not render *Vander Linden* inapplicable." *Id.* at 10. The Court, however, cannot agree with Plaintiffs' characterization of *Vander Linden* on this point. The Fourth Circuit in *Vander Linden* simply prevented the state from hiding behind prior legal decisions, which held that some powers of the local delegations were unconstitutional, since the local delegations still exercised

those powers in contravention of the law. *See Vander Linden*, 193 F.3d at 277 ("Moreover, the [district] court did not find that the legislative delegations have in practice observed the limits set by the state supreme court. And indeed, nothing in the record suggests that the delegations have limited their activities in this manner .... For example, the delegations regularly approve particular local agency budgets pursuant to statute, despite South Carolina Supreme Court rulings striking down two statutes that gave similar budget-approval powers to certain delegations. Thus for purposes of equal protection review, we must regard the undisputed record evidence (including most notably the parties' stipulations) and the state statutes currently on the books, rather than court rulings invalidating a handful of other statutes, to be determinative of the powers exercised by local delegations.").

In short, the Georgia General Assembly's local delegations do not hold any separate governmental office or power related to the political subdivisions of the State of Georgia. Instead, they operate solely within the procedural and political confines of the General Assembly, a body that undisputedly has been constitutionally apportioned in accordance with the "one person, one vote" requirement. Local delegations and the rules that apply to local legislation are simply internal management tools that assist the General Assembly in handling vast quantities of legislation. As a practical matter, the voter dilution of which Plaintiffs complain is necessitated by apportionment of the General Assembly according to population. Allowing legislators in split districts to vote on local legislation affecting some of their constituents is not the sort of invidious discrimination condemned by the reapportionment cases. A legislative rule or practice that requires or encourages consensus on the part of representatives and senators of those citizens most affected by a local bill before the full legislature votes on the bill is not unconstitutional. As a matter of fact, we as citizens probably should fear the consequences that might result if legislators from localities not affected by a particular local bill refused to consider the views of those legislators whose constituents are affected. Accordingly, the remaining Defendants are entitled to judgment as a matter of law on the Plaintiffs' equal protection claims.

### D. VOTING RIGHTS ACT

 Changes in the Rules of the General Assembly have not been submitted to the Justice Department for preclearance. Consequently, Plaintiffs claim that the Rules are invalid pursuant to the Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.*, as amended. They do not identify any specific rule changes. Defendants respond that the Act does not apply

to internal rules of the legislature. Plaintiffs contend that their Voting Rights Act claims should not be dismissed and that a three-judge district court should be empaneled to hear this action. In general, a three-judge panel must be convened to hear a suit brought pursuant to Section 5 of the Voting Rights Act. 42 U.S.C. § 1973c. A three-judge district court, however, is not required if the Court concludes that the plaintiff's Section 5 claims are insubstantial, frivolous, or clearly without merit. *United States v. Saint Landry Parish School Bd.*, 601 F.2d 859, 865 (5th Cir.1979);[12] *Broussard v. Perez*, 572 F.2d 1113, 1118 (5th Cir.1978); *Moore v. Caledonia Natural Gas Dist.*, 890 F.Supp. 547, 549 (N.D.Miss.1995); *Montgomery v. Leflore County Republican Executive Committee*, 776 F.Supp. 1142, 1144–45 (N.D.Miss.1991); *Miller v. Daniels*, 509 F.Supp. 400, 405 (S.D.N.Y.1981); *Webber v. White*, 422 F.Supp. 416, 423–25 (N.D.Tex.1976). "Individuals must not be allowed to obtain a three-judge court, with its concomitant burdens, simply by intoning the catchwords of § 5. This court has an obligation to examine the complaint to determine whether it states a substantial claim." *Miller*, 509 F.Supp. at 405. A Section 5 claim is clearly without merit if Supreme Court precedent provides that preclearance requirements do not apply to the situation before the court. *LULAC v. Texas*, 113 F.3d 53, 55 (5th Cir.1997); *Broussard v. Perez*, 572 F.2d 1113, 1119 (5th Cir.1978). After careful and thorough review, the Court concludes that a three-judge panel should not be convened in this case since Plaintiffs' Voting Rights Act claims are clearly without merit based on prior Supreme Court precedent and must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). To conclude otherwise and convene a three-judge court in this case would result in the unnecessary waste of judicial resources. *See, e.g., Allen v. State Bd. of*

---

12. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

*Elections,* 393 U.S. 544, 561, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) ("We have long held that congressional enactments providing for the convening of three-judge courts must be strictly construed. Convening a three-judge court places a burden on our federal court system, and may often result in delay in a manner needing swift initial adjudication." (Citations omitted.)).

Section 5 limits the ability of certain states and political subdivisions to change their voting laws, regulations, or procedures from those that existed on or before November 1, 1964. 42 U.S.C. § 1973c. The State of Georgia and its political subdivisions are among those subject to the requirements of Section 5. *See* 28 C.F.R. Part 1 & § 51.6 (providing that Georgia is a "covered jurisdiction," as are its "political subunits"). Before enacting any voting law changes, the covered state or political subdivision must first obtain from the Attorney General of the United States or the United States District Court for the District of Columbia a finding that the modification "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. This process commonly is referred to as "preclearance." The Supreme Court has interpreted the preclearance requirement broadly, so that it "reach[es] any state enactment which altered the election law of a covered State in even a minor way." *Allen v. State Bd. of Elections,* 393 U.S. 544, 566, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

██ The preclearance requirements, however, apply to legislative internal rule changes in only the most limited of circumstances. In *Presley v. Etowah County Commission,* 502 U.S. 491, 503, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), the Supreme Court explained that it has required preclearance in four situations: (1) changes to the manner of voting; (2) changes to candidacy requirements and qualifications; (3) changes to the composition of the electorate; and (4) changes that affect the creation or abolition of an elective office. *Id.*

at 502–03, 112 S.Ct. 820. "[E]ach has a direct relation to voting and the election process." *Id.* at 503, 112 S.Ct. 820. The plaintiffs in *Presley* challenged alterations to an Alabama county's practice that had allowed each commissioner full authority to determine how to spend funds in his own road district. The plaintiffs and the United States, as amicus curiae, argued for a position that the Supreme Court stated would mean that Section 5 embraces the routine actions of state and local governments at all levels. *Id.* at 494, 112 S.Ct. 820. The Court admitted that "in a real sense every decision taken by government implicates voting. That is but the felicitous consequence of democracy, in which power derives from the people." *Id.* at 504, 112 S.Ct. 820. Despite the fact that every government decision in some way affects voting, the Supreme Court concluded that the Voting Rights Act's preclearance requirements did not apply in *Presley,* where Plaintiffs challenged only internal governance procedures. It was irrelevant that some commissioners possessed less political power after the change:

> Appellants argue that the Common Fund Resolution is a covered change because after its enactment each commissioner has less individual power than before the resolution. A citizen casting a ballot for a commissioner today votes for an individual with less authority than before the resolution, and so, it is said, the value of the vote has been diminished. Were we to accept appellants' proffered reading of § 5, we would work an unconstrained expansion of its coverage.

*Id.* The Court concluded by holding that "[c]hanges which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 506, 112 S.Ct. 820.

██ Based on the precedent of *Presley,* this Court must conclude that preclearance was not required in this case. It is true that changes in the various legis-

lative delegations' rules might affect the distribution of power among officials and certain officials may have more or less authority after the changes. It is also true that the value of a citizen's vote may be diminished when his elected representative has less authority. Nevertheless, the Supreme Court has clearly, unmistakably, and explicitly held that such changes in internal rules and procedures do not raise a Voting Rights Act preclearance issue. *Id.* There is no claim in this action that the Rules of the General Assembly are being used to abridge the right to vote on account of race or color. Furthermore, the Voting Rights Act has never been interpreted as giving the Department of Justice broad supervisory authority over the internal operation of state legislatures. "If federalism is to operate as a practical system of governance and not a mere poetic ideal, the States must be allowed both predictability and efficiency in structuring their governments." *Id.* at 510, 112 S.Ct. 820. Accordingly, the Defendants are entitled to judgment as a matter of law with regard to Plaintiffs' Voting Rights Act claims.

Plaintiffs are apparently disappointed in the result of the legislative process in the General Assembly. If they are entitled to a remedy, it cannot come from this Court. It can come from the political process. To redress their grievance, Plaintiffs can lobby members of the General Assembly to change the procedural rules governing local legislation. Plaintiffs can run for the legislature themselves and, if elected, stymie the legislative process by objecting to the local consent calendar every morning until other legislators address their concerns. Plaintiffs can support candidates running in other districts in Fulton County who agree with their legislative agenda. Plaintiffs can support an amendment that broadens the home rule provisions of the Georgia Constitution. Plaintiffs can campaign for a Lieutenant Governor and Speaker of the House who could use the carrot of committee appointments and their other persuasive powers to reform

the House and Senate rules. Plaintiffs can even offer a candidate for Governor who will use his or her bully pulpit and full arsenal of executive powers to encourage the change that Plaintiffs desire. Although it is true that some of these possibilities may be politically less realistic than others, the possibilities for redress through the political process are manifold.

## E. CLASS CERTIFICATION

Plaintiffs have filed a Motion for Certification of Class Action [Doc. 17]. In light of the Court's grant of Defendants' Motion to Dismiss the Amended Complaint, the Court need not address Plaintiffs' class certification motion. Accordingly, the Court denies as moot Plaintiffs' Motion for Certification of Class Action.

## IV. CONCLUSION

This case presents a justiciable controversy. On the merits, there is no violation of our federal Constitution. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). It, however, is not the province of the federal judiciary in the name of the equal protection of the laws to interfere in such internal political matters as how a state legislature seeks to reach consensus on local legislation. The Georgia General Assembly possesses inherent authority to manage its own internal affairs, especially with regards to hammering out political compromise. As long the House and Senate do not entirely abdicate their lawmaking responsibility to local legislative delegations, the "one person, one vote" requirement does not apply to those delegations. Furthermore, procedural changes to the delegations' internal rules need not be precleared by the Attorney General of the United States or the United States District Court for the District of Columbia. Accordingly, Defendants' Motion to Dismiss the Amended Complaint

[Doc. 20] treated as a Motion for Summary Judgment with respect to the equal protection claims GRANTED. The Plaintiffs' Motion for Partial Summary Judgment [Doc. 13] is DENIED. Additionally, Defendants' initial Motion to Dismiss [Doc. 5] is DENIED AS MOOT. Plaintiffs' Motion for Certification of Class Action [Doc. 17] is DENIED AS MOOT.